_____

No. 93-3303
_____

United States of America,          *
                                    *
        Plaintiff-Appellee,         *
                                    *
    v.                              *
                                    *
Janette Lohman, Director of         *   Appeal from the United States
Revenue, State of Missouri;         *   District Court for the Western
Missouri Department of Revenue;     *   District of Missouri.
State of Missouri,                  *
                                    *
        Defendants-Appellants,*
                                    *
Kansas City Power & Light Co.,      *
                                    *
        Defendant.                  *
                          _____

            Submitted:  May 15, 1995

            Filed:  January 22, 1996
                          _____

Before McMILLIAN, BEAM and HANSEN, Circuit Judges.
                          _____

BEAM, Circuit Judge.


     Missouri imposed sales tax on electricity used at a federal facility, the Lake City Army Ammunition Plant.  The United States argues that the tax is a constitutionally prohibited direct tax on the federal government.  Alternatively, the United States contends that the contractor-operator of the plant, Olin Corporation, purchased the electricity from a vendor, Kansas City Power & Light Company, and then resold it to the federal government.  Since the Missouri sales tax does not apply to such "sales for resale," the United States contends that the sale of electricity was not taxable.

Concluding that the "sale for resale" provision applied, the district court[1] granted the federal government's motion for summary judgment. Missouri appeals. After reviewing the grant of summary judgment de novo, we affirm because the tax is unconstitutional as a direct tax on the United States.

## I. BACKGROUND

The United States Department of the Army owns the Lake City Army Ammunition Plant (the Plant), which manufactures small caliber ammunition. In 1951, the federal government entered into a contract, number DA-23-012 AV-76,[2] with Kansas City Power & Light Company (KCPL). Under the contract, KCPL "shall sell and deliver to the Government and the Government shall purchase and receive from [KCPL] . . . electrical service" at the Plant. Jt. App. at 653. The contract provides that it "shall continue in effect until terminated at the option of the Government by the giving of not less than 30 days advance written notice of the effective date of termination." Id. Initially, KCPL submitted bills directly to the United States and the United States sent treasury checks to pay for the electricity. Title to the electricity passed directly from KCPL to the United States.

In an effort to reduce paperwork and administrative hassle, the federal government hired a contractor, Remington Arms, to run the plant. Shortly thereafter, the government requested that KCPL bill Remington Arms directly for all purchases. In 1962, the United States and KCPL modified the 1951 contract with a

---

[1]The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

[2]Several years later, the contract number was changed to DAAA19-70-D-0001. No substantive change was effected. For simplicity's sake, we will refer to the contract by the old number or as "the 1951 contract."

supplemental agreement.[3]  Remington Arms was not a party to this agreement.  The supplemental agreement provides that:

> The following paragraph is hereby inserted in the [1951] Contract:
>
> 1. SCOPE AND TERM OF CONTRACT
>
> It is understood and agreed between the parties that so long as the plant is operated for the Government by a CPFF Contractor, currently Remington Arms Company, Inc., orders for service under this contract may be placed with [KCPL] by such CPFF Contractor and will be honored to the same extent as will orders placed by the Government, all in accordance with the terms and conditions of this contract.  Furthermore, during such period of time [KCPL] agrees that placing of such orders, and payment thereof by such CPFF Contractor, will satisfy the requirements of this contract concerning minimum monthly accounts to be ordered and paid for by the Government.

Jt. App. at 674.  Under the contract as modified, title to the electricity still passes directly from KCPL to the government.

In 1985, Olin Corporation succeeded Remington Arms as the CPFF Contractor for the plant.[4]  Olin began informing outside vendors of the change in contractors.  During this time, Olin issued a purchase order on its own stationery, referencing the 1951 contract,[5] and requesting continued electricity in accordance with

---

[3]The 1951 contract has also been modified in other minor ways. These modifications are not relevant here.

[4]Olin's contract with the federal government provides that Olin acts as an independent contractor and not as an agent of the government.

[5]Relying on an isolated typographical error, Missouri contends that Olin's purchase order references not the 1951 contract but a 1947 contract that coincidentally bears the exact number as the 1951 contract.  This assertion is entirely unsupported.  We agree with the district court that the 1951 contract is the contract at issue.

the contract's terms.[6] The federal government has never provided KCPL with the written notice required to formally terminate the 1951 contract.

Determining who actually purchases the Plant's electricity first became an issue during an audit of KCPL by the Missouri Department of Revenue. As the supplier of electricity, it is KCPL's responsibility to submit remitted sales tax to the Missouri Department of Revenue. The Department of Revenue, after concluding that Olin purchases the plant's electricity, assessed back taxes

---

[6]The typewritten portion of the purchase order provides in relevant part:

> PROVIDE ELECTRIC SERVICE TO THE LAKE CITY ARMY AMMUNITION PLANT, INDEPENDENCE, MISSOURI, IN ACCORDANCE WITH CONTRACT NO. DA-23-012 AV-76 . . . BETWEEN THE UNITED STATES OF AMERICA AND THE KANSAS CITY POWER & LIGHT COMPANY.
>
> . . .
>
> Effective November 3, 1985, Olin Corporation, Winchester Group, became the new Contractor-Operator of the Lake City Army Ammunition Plant under Prime Contract Number DAAA09-85-Z-0006.
>
> . . .
>
> This Purchase Order covers electric services for the period November 3, 1985 through November 2, 1986 and shall automatically be extended for another year as long as the Buyer is required to process and pay invoices under Prime Contract Number DAAA09-85-Z-0006. This purchase order shall continue in effect until terminated at the option of the Buyer/U.S. Government by the giving of not less than thirty (30) days advance written notice of the effective date of termination.
>
> The terms and conditions of this purchase order shall be the same as Government Contract No. DA-23-012 AV-76 and Purchase Order No. LCO 83843 [Remington Arms Company's purchase order].

Jt. App. at 257-61.

relating to the Plant for the period of January 1986 to September 1989. KCPL paid the taxes under protest and commenced state administrative proceedings challenging the assessment. KCPL also brought a lawsuit against Olin, demanding payment of the taxes.

The United States Government then brought this action challenging the imposition of the sales tax. As previously indicated, the district court determined that the "sales for resale" provision applied and granted the government's motion for summary judgment.

## II.  DISCUSSION

Missouri argues, among other things, that an intervening decision of this circuit makes the relief granted by the district court on the "sale for resale" issue improper. See United States v. Lohman, 21 F.3d 844 (8th Cir. 1994). Rather than decide that issue, we exercise our option to affirm the district court's judgment on any grounds supported by the record. See Keller v. Bass Pro Shops, Inc., 15 F.3d 122, 123 (8th Cir. 1994). In doing so, our focus shifts to the federal government's argument that assessing Missouri sales tax upon electricity sold to the plant is an unconstitutional tax on the United States itself.

"[A] State may not, consistent with the Supremacy Clause, U.S. Const. Art. VI, cl. 2, lay a tax `directly upon the United States.'" United States v. New Mexico, 455 U.S. 720, 733 (1982) (quoting Mayo v. United States, 319 U.S. 441, 447 (1943)). Under current conceptions of federal immunity, this prohibition means that "the States can never tax the United States directly but can tax any private parties with whom it does business, even though the financial burden falls on the United States, as long as the tax does not discriminate against the United States or those with whom it deals." South Carolina v. Baker, 485 U.S. 505, 523 (1988). Taxes are considered to fall directly upon the federal government

-5-

only if the legal incidence of the tax falls on the federal government itself.  See, e.g., United States v. County of Fresno, 429 U.S. 452, 459-460 n.7 (1977); New Mexico, 455 U.S. at 742.

Missouri contends that taxing the plant's electricity is not a direct tax on the United States.  First, it argues that the Missouri tax statute places the legal incidence of Missouri's sales tax on the seller, KCPL, and not the purchaser.  Because it is undisputed that the federal government is not the seller, Missouri reasons that the sales tax cannot possibly be a tax on the government.  Alternatively, Missouri contends that even if the statute places the legal incidence of the sales tax on the purchaser, Olin purchases the electricity, not the federal government.

## A.

The terms of a statute control where the legal incidence of the tax falls.  "[A] sales tax which by its terms must be passed on to the purchaser imposes the legal incidence of the tax upon the purchaser." First Agricultural Nat'l Bank v. State Tax Comm'n, 392 U.S. 339, 347 (1968); accord, United States v. Tax Comm'n, 421 U.S. 599, 608 (1975).  Missouri argues that the Missouri sales tax law does not require passing the tax on to the purchaser.

The introductory portion of the Missouri sales tax statute provides, "A tax is hereby levied and imposed upon all sellers for the privilege of engaging in the business of selling tangible personal property or rendering taxable service at retail in this state."  Mo. Rev. Stat. § 144.020.1.[7]  Other portions, however, emphasize the purchaser's role, stating that the seller "shall collect the tax from the purchaser," and making it a misdemeanor

---

[7]Electricity is specifically included in this tax.  See Mo. Rev. Stat. § 144.020.1(3).

-6-

for a purchaser to refuse to pay Missouri sales tax.  Mo. Rev. Stat. §§ 144.080.4; 144.060.

To interpret this potentially conflicting language, Missouri urges us to adopt the position of the Missouri state courts, who have repeatedly construed the sales tax as a tax upon the seller. See, e.g., Centerre Bank v. Director of Revenue, 744 S.W.2d 754, 759 (Mo. 1988); Farm & Home Savings Assoc. v. Spradling, 538 S.W.2d 313, 316 (Mo. 1976).  In doing so, Missouri courts have regarded the legal duty of purchasers, under section 144.060, to pay the sales tax, as essentially irrelevant.  "The fact that the purchaser bears the economic burden of the sales tax does not alter the statutory scheme which imposes the sales tax on sellers." Centerre Bank, 744 S.W.2d at 759.

In determining the existence of federal immunity, we are not bound by the Missouri courts' interpretation of state tax law. Diamond Nat'l Corp. v. State Bd. of Equalization, 425 U.S. 268 (1976) (per curiam).  Nonetheless, if the state courts' determination is "consistent with the statute's reasonable interpretation it will be deemed conclusive." American Oil Co. v. Neill, 380 U.S. 451, 455-56 (1965).

The Missouri courts' construction of the sales tax may be appropriate, for instance, when Missouri is attempting to collect the tax from noncompliant sellers.  When evaluating the legal incidence of the tax for immunity purposes, however, we find the Missouri courts' construction inconsistent with the statutes' reasonable interpretation.  As noted, Missouri law provides that the seller "shall collect from the purchaser" the amount of sales tax due.  Mo. Rev. Stat. § 144.080.4.  The purchaser's failure to pay the tax is a misdemeanor.  Mo. Rev. Stat. §§ 144.060. Given these provisions, and for the sole purpose of determining the

existence of federal immunity, we find that the legal incidence of the Missouri sales tax falls on the purchaser.[8]

Our conclusion is confirmed by the section which prohibits sellers from "advertis[ing] or hold[ing] out or stat[ing] to the public or to any customer directly or indirectly that the [sales] tax . . . required to be collected by him, will be assumed or absorbed by the [seller,] or that it will not be separately stated and added to the selling price of the property sold or service rendered, or if added, that it or any part thereof will be refunded." Mo. Rev. Stat. § 144.080.5. This ban against public display of a seller absorbing the tax suggests that Missouri intended for the tax to fall upon the purchaser. See, e.g., First Agricultural Nat'l Bank, 392 U.S. at 347-48 (construing a similar provision in a Massachusetts statute to imply that the tax is on the purchaser).

## B.

Concluding that the Missouri statute places the legal incidence of its sales tax upon the purchaser does not end our inquiry. We must determine whether the federal government is the purchaser of the electricity. If it is, the legal incidence of the tax falls on the federal government and the tax is prohibited as a direct tax on the United States.

The United States has been actively involved in obtaining electricity. It negotiated future rates and chose the vendor for the electricity, KCPL. It executed an indefinite delivery contract

---

[8]Missouri's argument may also have little relevance because of our ultimate conclusion that imposing the sales tax on the Plant's electricity is unconstitutional as a direct tax on the United States. As such, the sale of the electricity to the United States is a tax-exempt transaction under Missouri law. See Mo. Rev. Stat. § 144.030.1.

with KCPL in 1951. The plain language of the 1951 contract provides that "the Government shall be liable for the minimum monthly charge specified in this contract." Jt. App. at 653. Although the 1951 contract has been modified several times, the contract is still in existence. Conversely, Olin does not have a direct contract with KCPL.[9] At most, Olin serves as the federal government's "paymaster," and has a contractual obligation to pay for the electricity under its contract with the federal government. Taken as a whole, these factors require the conclusion that the federal government, and not Olin, is the purchaser of the Plant's electricity.

Despite the federal government's involvement, Missouri contends that Olin is the purchaser because Olin fills out the paperwork and signs the checks. To support its argument, Missouri relies on cases such as United States v. New Mexico, 455 U.S. 720 (1982), and Alabama v. King & Boozer, 314 U.S. 1 (1941). Those cases do not require a denial of immunity here. In both cases, the contractors made the purchases in their own names and had direct contractual liability to the vendors. New Mexico, 455 U.S. at 743; King & Boozer, 314 U.S. at 11-12. There, the federal government did not have a separate contract with the vendor, but attempted to obtain immunity based in part on its responsibilities under its internal contract with the contractor. New Mexico, 455 U.S. at 724, 743; King & Boozer, 314 U.S. at 8, 10. Here, the federal government has a direct contract with the vendor and the contractor

---

[9]Missouri's contention that Olin's purchase order represents a separate contract with KCPL is unsupported. The purchase order does not purport to be a separate contract. It requests KCPL to provide electric service to the Plant in accordance with the 1951 contract between the United States of America and KCPL. The third page of the purchase order reiterates that the terms and conditions of the purchase order shall be the same as the 1951 contract. For these reasons, the purchase order is most properly considered to be an administrative or procedural document.

does not.  Because of these differences in contractual obligations, New Mexico and King & Boozer have little relevance.[10]

Although it is not controlling, our decision is supported by the reasoning of our sister circuit in United States v. Kabeiseman, 970 F.2d 739 (10th Cir. 1992).  The Kabeiseman court determined that the United States was immune from Wyoming sales tax on diesel fuel used by a contractor at a federally owned facility.  Id. at 744.  In Kabeiseman, the contractors told the federal government how much fuel it needed, and then the federal government ordered the fuel directly from a government-chosen vendor.  Although title passed directly to the federal government, the contractors accepted delivery of the fuel, exercised substantial control over the use of the fuel, and paid the bills directly to the vendor.  In finding the federal government immune from the state sales tax, the Kabeiseman court relied primarily on the federal government's intensive involvement with the vendor: The United States "placed the orders for diesel fuel, as well as taking title thereto, directly from the vendor."  Id. at 743.  The federal government's involvement with KCPL is similarly intensive.[11]

---

[10]Missouri also argues that granting the federal government immunity here permits federal immunity to be acquired by the "stroke of a pen."  We are mindful of the Supreme Court's wariness towards immunity that can be acquired without cost to the federal government.  See New Mexico, 455 U.S. at 737 (criticizing government's technical argument that its contractors are entitled to immunity "because, among other things, they draw checks directly on federal funds, instead of waiting a time for reimbursement").  As we have previously indicated, however, the federal government's involvement here surpasses technicalities: its own credit is on the line.

[11]Missouri argues that Kabeiseman is distinguishable because the checks issued by the Kabeiseman contractor were drawn directly on federal funds, rather than the reimbursement method used by Olin.  The Kabeiseman court did not rely on the funding mechanism, however, and we do not consider the small funding difference to suggest a different result here.

-10-

Aside from its constitutional argument, Missouri provides two reasons why we should consider Olin to be the purchaser of the electricity. Neither reason is persuasive. First, Missouri contends that the 1962 supplemental agreement discharged the federal government's obligation. See supra page 3. We disagree. The terms of the supplemental agreement do not unconditionally discharge the federal government from its obligations. Instead, the supplemental agreement merely permits actions by another party, Olin, to satisfy the federal government's obligations. If Olin fails to order or pay for electricity, the terms of the supplemental agreement do not exempt the federal government from liability.

Second, Missouri argues that because the federal government conceded that it might suffer tax disadvantages after implementing the supplemental agreement, it should not receive immunity from taxation. The alleged concession involves the federal government's admission that permitting contractors to deal directly with vendors was a calculated risk.[12] We do not consider the alleged concession relevant in our determination of federal immunity. To do otherwise transforms cautious planning by federal bureaucrats into an invitation for states to rummage through the federal pocketbook.

------

[12]The alleged concession is as follows:

> It is the responsibility of the CPFF or other cost type contractor to utilize [federal government] indefinite delivery type contracts for any and all types of services and supplies where the price, quality and terms obtained are more advantageous than could be obtained otherwise. In certain instances it is possible that the Government will suffer tax disadvantages as a result of this revised procedure. The procedure has been adopted with due advertence to this fact on the basis that the overall savings possible thereby will more than offset any possible cost increase resulting from taxes.

Jt. App. at 1786.

-11-

We have considered Missouri's other arguments and find them to be without merit.

## III.  CONCLUSION

Under the present contractual arrangement, we conclude that the United States Constitution prohibits Missouri from imposing sales tax on electricity for the Lake City Army Ammunition Plant because such a tax is a direct tax on the federal government.  We therefore affirm the judgment of the district court.

A true copy.

Attest:


CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.